Business Supplies Corp. of America v. Conole

*Williams & Williams* and *Morgan, Lewis & Bock-ius*, for plaintiff.

*Harry F. Lee*, for defendant.

DAVIS, P. J., January 11, 1966.—The instant complaint in equity involves one corporation and two individuals. Plaintiff, Business Supplies Corporation of

America, is a Massachusetts corporation qualified to do business in Pennsylvania. It is engaged in manufacturing and distributing business supplies of the type used in data processing, including tabulating cards. Plaintiff maintains general offices at Skytop, Pa., and manufacturing plants at Marietta, Ga., Holyoke, Mass. and Beltville, Md. Defendant, Richard C. Conole, was a director of plaintiff for several years prior to March 12, 1965, and also served in the capacities of either vice chairman of the board or president of the corporation, as well as vice president. His service as director was terminated on March 12, 1965, and his service as an officer of plaintiff was terminated March 13, 1965. John F. Langan is an individual who has been seeking to develop a process for manufacturing a type of aperture tabulating card adaptable to use in conjunction with microfilm. Up to the time when this complaint was filed, there had not been any contractual agreement between Langan and plaintiff corporation providing for the participation by the latter in the exploitation of the process.

The complaint avers that plaintiff, for more than one year, "has been engaged at its plant in Marietta, Georgia, in a program of research and development in collaboration with John F. Langan . . . for the development of Langan's process to produce socalled 'aperture' tabulating cards, which cards can be used in conjunction with microfilm"; that it "has invested substantial amounts of time and money in support of said research, of a value in excess of $10,000"; that it "has conducted and is now [as of June 23, 1965, the date of execution of the complaint] conducting negotiations with Langan for the participation by plaintiff in the exploitation of Langan's process for the production of aperture cards"; that defendant, during his period of service, had access to all the files and records of plaintiff corporation and was responsible for

the custody and maintenance of certain files; and, in particular, that defendant was one of the officers responsible for conducting correspondence and negotiations, and maintaining files relevant to the Langan project. Against the foregoing introductory background, the complaint sets forth two counts, the first dealing with the alleged improper retention of files and records by defendant, and the second dealing with defendant's alleged negotiations with Langan.

In count no. 1, it is averred that "On or about January 8, 1965 [while Defendant was still an officer of Plaintiff Corporation], defendant directed an employee of BSC who was under his supervision and control to transport from the offices of BSC to the house occupied by defendant at Skytop, Pennsylvania two file cabinets of four drawers each; seven of said eight file drawers were stuffed with file folders and papers of a business nature and one drawer was half filled with such file folders and papers"; that, after notice to return this property to plaintiff, defendant has refused to do so; and that, although plaintiff has been unable to determine the contents of the two cabinets, it believes that they contain: the file relating to the Langan project, the file concerned with a "versitile" [sic] press in the Holyoke plant, the "General Envelope File", containing cost data relevant to envelopes produced at the Holyoke and Beltville plants, a set of monthly performance reports for the use of plaintiff's directors known as the "Blue Books", and sets of weekly reports for the use of officers containing: (1) weekly sales reports, (2) weekly labor costs reports, and (3) weekly reports on paper inventory. In the prayer for relief, plaintiff has requested that the two cabinets and contents be impounded by the sheriff and that defendant be restrained from making copies of the contents and from disclosing to anyone, save counsel, any information contained therein. Apparently

through inadvertence, plaintiff has not requested return of the cabinets and their contents, but such relief, if warranted, will be available under the general request at the end of the complaint. By order of this court dated July 9, 1965, a preliminary injunction was awarded, directing the Sheriff of Monroe County to impound the two cabinets and contents and restraining defendant from making copies thereof or from disclosing to anyone, save counsel, any information contained therein.

Defendant has filed preliminary objections demurring to count no. 1. In support, counsel presents a line of reasoning which may be summarized as follows: (1) in the absence of any covenant by defendant not to compete or not to disclose corporate information, plaintiff is not entitled to a decree restraining such disclosure unless plaintiff can establish a confidential relationship between plaintiff and defendant, citing Spring Steels, Inc. v. Molloy, 400 Pa. 354 (1960); and Wexler v. Greenberg, 399 Pa. 569, 576 (1960); (2) whatever confidential relationship previously existed between the parties was brought to an end when plaintiff terminated defendant's service as a director and as vice-chairman of the board, citing 3 Fletcher Cyclopedia, Private Corporations, §860; (3) the complaint fails to allege any wrongful act by defendant with relation to the corporate files, other than improper retention; (4) therefore, the only relief to which plaintiff is entitled is *restoration of possession* of the files, an objective which could be adequately attained by relegating plaintiff to an action at law for replevin.

The relation of directors and officers to a corporation is defined in the Business Corporation Law of May 5, 1933, P. L. 364, art. IV, sec. 408, 15 PS §2852-408:

"Officers and directors shall be deemed to stand in

a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill ordinarily prudent men would exercise under similar circumstances in their personal business affairs".

An officer whose service with a corporation has been terminated may compete with his former employer, in the absence of a restrictive covenant not to do so: Spring Steels, Inc. v. Molloy, supra. There, Peter Molloy had been vice-president of Spring Steels. On October 3, 1958, he left that company, took with him four key employes and became president of Industrial Spring Steel, Inc., which operated in competition with the former. Spring Steels brought an action in equity against Industrial Spring Steel and its five former employes, charging unfair competition and averring that the new company was using plaintiff's customer list, making use of knowledge and skill obtained by two machinists while they had been employed by plaintiff, and operating a cutting and filing machine patterned after a similar machine used by plaintiff. The Supreme Court affirmed a decree dismissing the complaint, and Mr. Justice Musmanno quoted the language of Mr. Justice Hughes, drawn from the decision in Pittsburgh Cut Wire Company v. Sufrin, 350 Pa. 31, 35 (1944):

"A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer: Williston on Contracts, sec. 1646, p. 4627".

Of equal validity, however, is the principle which Mr. Justice Musmanno stated as follows:

*"This does not mean, however, that an employee,*

*departing from his employer's establishment, may
take with him anything which, in law, belongs to the
employer*". (Italics supplied.)

While these two principles are sufficiently clear,
difficulty often arises in applying them to specific fac-
tual situations. In Spring Steel, it was necessary to
determine whether or not the customer lists, which de-
fendant was using against plaintiff's protest, "be-
longed", in an exclusive sense, to plaintiff. Although
the court held that they did not, Mr. Justice Mus-
manno quoted the language of Mr. Justice Cohen in
Morgan's Home Equipment Corp. v. Martucci, 390 Pa.
618, 623 (1957):

"In many businesses, permanent and exclusive re-
lationships are established between customers and
salesmen. The customer lists and customer informa-
tion which have been compiled by such firms repre-
sent a material investment of employers' time and
money. This information is highly confidential and
constitutes a valuable asset. Such data has been held
to be property in the nature of a 'trade secret' for
which an employer is entitled to protection, independ-
ent of a non-disclosure contract, either under the law
of agency or under the law of unfair trade practices".

Mr. Justice Musmanno then went on to say:

"This is, of course, good law, but it is not applicable
in the case at bar because the customer lists here in-
volved were not the product of any special work on the
part of the plaintiff company, nor were they confiden-
tial . . . On the contrary, as the chancellor properly
found from the evidence in the case: 'The bulk of the
additions made by defendant Kerschbaum during the
course of his employment by plaintiff came from in-
formation contained in trade journals and ordinary
listings in the telehpone directory' ".

Counsel for defendant have also cited Wexler v.
Greenberg, supra. There, plaintiffs, trading as Buck-

ingham Wax Company, were engaged in the business of manufacturing, compounding and blending sanitation and maintenance chemicals. They employed Greenberg, a chemist qualified in that field. In the performance of his duties, Greenberg consumed half of his working time in Buckingham's laboratory, where he would analyze and duplicate competitors' products and then use the resulting information to develop various new formulas. The remainder of his time was spent in ordering necessary materials and interviewing chemical salesmen concerning new, better or cheaper ingredients for the multitude of products produced by Buckingham so that costs could be lowered and quality increased. As a result of his activities, Greenberg was not only familiar with Buckingham's formulas, but also with the costs of the products and the most efficient method of producing them. Greenberg left Buckingham and joined a competitor, Brite Products Co., Inc., becoming a director, treasurer and chief chemist for the latter company. Plaintiff brought an action in equity to restrain defendant from using, on behalf of Brite Products Co., formulas concerning which he gained knowledge during his employment by plaintiff. The lower court granted an injunction, but this decree was reversed by the Supreme Court.

The court, in an opinion by Mr. Justice Cohen, recognized the persuasive authority of Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd., 239 Mass. 158, 131 N. E. 307 (1921), to the effect that a person employed by one company in a program of experimentation and research may be restrained, after leaving that company, from taking with him the fruits thereof and using them for the benefit of the company with which he subsequently found employment. Mr. Justice Cohen then said:

"Upon our examination of the record here, however, we find that the instant circumstances fall far short

of such a relationship. The chancellor's finding that Greenberg, while in the employ of Buckingham, never engaged in research nor conducted any experiments nor created or invented any formula was undisputed. There is nothing in the record to indicate that the formulas in issue were specific projects of great concern and concentration by Buckingham; instead it appears they were merely the result of Greenberg's routine work of changing and modifying formulas derived from competitors. Since there was no experimentation or research, the developments by change and modification were fruits of Greenberg's own skill as a chemist without any appreciable assistance by way of information or great expense or supervision by Buckingham, outside of the normal expenses of his job".

From the foregoing analysis of Spring Steel and Wexler, it is apparent that the Supreme Court there denied protection to corporate information because of the absence of the very factors which, in the instant action, are alleged to be present. It is averred in paragraph 8 of the complaint that plaintiff, for more than a year, "has been engaged at its plant in Marietta, Georgia, in a program of research and development in collaboration with John F. Langan . . . for the development of Langan's process to produce so-called 'aperture' tabulating cards, which cards can be used in conjunction with micro-film"; and, in paragraph 9, that plaintiff "has invested substantial amounts of time and money in support of such research, of a value in excess of $10,000". We think these averments state a sufficient case entitling plaintiff to equitable protection for the information derived from this developmental research project. For additional authority, see: Winston Research Corporation v. Minnesota Mining and Manufacturing Company, 350 F. 2d 134 (9th Cir., 1965) ; and Dozor Agency v. Rosenberg, 403 Pa. 237 (1961). In the latter case, the Supreme Court affirmed

a decree granting a preliminary injunction, and Mr. Justice Bell (later Chief Justice) said:

"Rosenberg was employed by plaintiff as a sub-agent in 1951; he was thereafter promoted to sales manager and later to president of the company. In these capacities he occupied a position of trust and confidence and had access to all the records of plaintiff. When Rosenberg resigned from the plaintiff company in May, 1960, he secretly took from the files and possession of the plaintiff certain of its confidential records and data, including names, premium dates and amounts, and pertinent information concerning the active policy-holders to whom plaintiff had sold insurance. These constituted a very valuable asset of plaintiff.

"Plaintiff also averred that these records and information were taken not only for Rosenberg's own benefit, but also for the benefit of the other defendant, World; that Rosenberg's conduct was made known to World, but that World acquiesced in and encouraged Rosenberg's course of conduct and knowingly received, accepted and made use of the confidential information, property and records of plaintiff for its own benefit and to the detriment of plaintiff. These averments were sufficient to justify a preliminary injunction against both Rosenberg and World, although the injunction was issued only against Rosenberg: Robinson Electronic Supervisory Co. v. Johnson, 397 Pa. 268, 154 A. 2d 494; Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A. 2d 838; Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688; Restatement, Torts §757, comment b; Restatement, Agency 2d §396 (b)".

Next, counsel for defendant assert that plaintiff has failed to state a case for equitable relief because the complaint does not contain an allegation of any act of wrongdoing by defendant other than wrongful

possession. One of the functions of equitable proceedings is to prevent wrongs, and a party need not wait until he has actually been injured before seeking preventive relief in equity. In Gamlen Chemical Co. v. Gamlen, 79 F. Supp. 622 (D. C., W. D. Pa. 1948), defendant, Harry Cuthbert Gamlen, owned one third of the stock in plaintiff corporation, was a director and had acted as vice-president, secretary and treasurer. He had been placed in charge of the corporation's eastern division, and for this purpose, became a resident of the western district of Pennsylvania. In April, 1948, he resigned his official position as secretary and treasurer, but remained a director, and, sometime in April or May of that year, commenced to do a competitive business under the fictitious name of "C. Gamlen Company" at Pittsburgh and throughout substantial portions of the plaintiff's eastern division. Plaintiff brought suit for an injunction. Although the chancellor specifically found that no evidence had been offered to show that defendant was employing any of plaintiff's formulations in the production of his products, he awarded a preliminary injunction restraining defendant: "(d) from using in any manner any of the secret code books or formula books of the plaintiff, or any copies thereof, or any of the subject matter contained therein; [and] (e) from using in any way any of the books and records of the plaintiff or any other data of the plaintiff pertaining to sales, salesmen, distribution, prices, discounts and manufacturing or other information pertinent to the products of the plaintiff or its operations that were taken from the plaintiff, or any copies thereof, or any of the subject matter contained therein".

Counsel for defendant also have demurred to count no. 2 of the complaint, which contains, inter alia, these averments:

"28. Plaintiff is informed, believes, and therefore

avers that sometime prior to April 20, 1965, defendant made an offer and proposal to Langan by which defendant and/or corporations in which defendant has an interest, would produce for Langan aperture cards according to the Langan process.

"29. Said offer by defendant was intended to obtain for defendant, and/or corporations in which he has an interest, the fruits of the research conducted by Langan in conjunction with plaintiff, to the exclusion of plaintiff".

It also contains an averment which, as we shall observe later in the discussion, incorporates a conclusion of law with the factual content:

"26. Defendant as a former director and officer of BSC owes to plaintiff a fiduciary duty not to use information obtained as an officer and director in competition with BSC and not to divert to defendant's own purposes corporate opportunities of which he first learned in his capacity as a director and officer of BSC".

The relief requested by plaintiff under count no. 2 is extremely broad and comprehensive. The court is asked to restrain defendant: "(d) . . . from using *any information* obtained by him in his capacity as a director and officer of BSC . . . *with regard to the data processing supplies business* . . . to compete *in any manner whatsoever* with plaintiff BSC" and (e) from engaging in *any communications or negotiations whatsoever* with John F. Langan . . . with regard to . . . the process developed by John F. Langan for the production of aperture *cards or* . . . *any other matter of any nature whatsoever connected with the data processing equipment and supplies industries,* and in particular, . . . from making any offers *of any nature whatsoever* to John F. Langan and from entering into *any contractual relation of any nature whatsoever* with John F. Langan, his agents, attor-

neys or associates, or any corporation or other entity in which John F. Langan has a substantial interest".

Disposition of defendant's demurrer to count no. 2 brings into play the same principles which we have already discussed in relation to count no. 1. The subject matter of count no. 1 was confined to the corporate information contained in the two file cabinets; whereas count no. 2 embraces *all* information obtained by defendant as an officer and director of plaintiff corporation *with regard to the data processing supplies business*. An order restraining defendant from using such information, without qualification, and restraining him from communicating, negotiating, or contracting with John F. Langan with regard to any matter connected with the data processing equipment and supplies industry, would be an injunction not to compete at all. Such broad relief, in view of the absence of any covenant not to compete, coupled with the severance on March 13, 1965, of defendant's last official connection with plaintiff corporation, cannot be supported: Spring Steels, Inc. v. Molloy, supra; Pittsburgh Cut Wire Co. v. Sufrin, supra; but plaintiff may well be entitled, if the proofs bear out the averments, to protection against the competitive use by defendant of confidential information belonging to plaintiff corporation: Dozor Agency v. Rosenberg, supra. Count no. 2 of the complaint, therefore, is not vulnerable to demurrer, even though plaintiff may not be entitled to the full measure of relief claimed.

Counsel for defendant object that three of the paragraphs of the complaint contain conclusions of law and assert that, for this reason, they should be stricken. Paragraph 26 alleges that "Defendant . . . owes to plaintiff a *fiduciary duty* not to use information obtained as an officer and director in competition with BSC. . . ."; paragraph 27 alleges that "As between plaintiff and defendant, plaintiff has the *sole right*

to negotiate with Langan for the development and exploitation of Langan's process. . . ."; and paragraph 32 alleges a threat of damage to BSC "by diverting from BSC to defendant and/or corporations in which defendant has an interest a business opportunity which, as between plaintiff and defendant, *belongs solely and exclusively* to plaintiff". As conclusions of law, these averments serve some useful purpose in that they mark out the theory of plaintiff's case. Of course, unsupported by factual allegations and proof, they will be of no avail to plaintiff; but their mere presence does not require the court to strike them from the complaint. This subject was discussed by President Judge Schaeffer and Judge Wissler in Armstrong Cork Company v. Kimmel, 2 D. & C. 2d 175 (C. P. Lancaster Co., 1954):

"In Goodrich-Amram's Commentary on the Pa. R. C. P., at pages 80 and 85, it is stated:

" 'Rule 1019(a) retains verbatim the language of §5 of the Practice Act of 1915 which requires the statement of "the material facts" in a "concise and summary form." . . . The Rule, however, omits that part of §5 which forbids the pleading of "evidence," "inferences" and "conclusions of law" '.

"At pages 86 and 87 of the commentary it is said:

" 'The elimination of the words "evidence," "inference" and "conclusion of law" from Rule 1019(a) does not mean that they may now be pleaded with impunity. On the contrary, the Rule refers only to the pleading of the "material facts", and the defendant, under Rule 1029(a), is required to answer only "the averment of fact" in the complaint. What the Rule really does is to remove the emphasis on form which was inherent in §5, which used the words "shall contain, and contain only." As a result, any inclusion of the forbidden material was a violation of the affirmative directive of the statute. Under the Rule, as now

drawn, the "evidence," "inference" or "conclusion of law" may be treated as harmless surplusage and ignored by the opponent in preparing the responsive pleading. In addition, the removal of the emphasis gives the court considerably more flexibility in construing the pleading, and will eliminate the bothersome speculation upon the exact definition of each of these vague terms' ".

Finally, and in conclusion, counsel for defendant have filed seven preliminary objections calling for more specific pleading as to eight paragraphs of the complaint. They seek additional illumination regarding the following general allegations: that BSC is engaged in an intensely competitive business; that a substantial market for Langan aperture cards exists and that those who participate with Langan in producing them will profit; and that damage to plaintiff resulting from deprivation of its corporate files will increase with the passage of each additional day. It should be obvious to anyone that all business, in the absence of monopoly, is competitive, and we can see no useful purpose in requiring plaintiff to plead evidentiary material to establish either the degree of intensity of competition, the probability that producers of Langan cards will profit, rather than lose money, or the probable damage *in future* to plaintiff resulting from deprivation of its files. Counsel next assumes that the collaboration between plaintiff and Langan, averred in paragraph 8 of the complaint, was based on a contract, and they wish plaintiff to plead whether it was written or oral, the time and place of contracting, the terms, the consideration, etc., etc. This is strictly irrelevant, since plaintiff averred, in paragraph 10 of the complaint, that it had no contract with Langan. Counsel requests similar additional pleading regarding defendant's offer to Langan, averred in paragraphs 28 and 29, and regarding Langan's demand

of plaintiff, averred in paragraph 30. As to the former, defendant should have that knowledge himself, if he made the offer as alleged. As to the latter, since the apparent purpose of the averment is to show damage, the following excerpt from the commentary to Pennsylvania Rule of Civil Procedure 1017(b), set forth in Goodrich-Am., Civil Practice §1017(b)-9, at page 117 is pertinent:

"A more specific complaint will not be ordered to develop matters which are essentially evidentiary. If defendant needs information to prepare his answer, it can be developed by discovery. Ramsey v. Hartnett, 7 Dist. & Co. Rep. (2d) 693 (1956) . . .

"In Moore v. Petroleum Heat & Power Co., C. P. No. 6, Phila. County, June Term, 1955, No. 3893 (1956), Judge Flood refused to require an amendment setting forth specific details of damages such as *losses on sales or losses of profits where these items were generally pleaded.* The court pointed out that the defendant can get all of the details by discovery proceedings". (Italics supplied.)

Defendant's preliminary objection to paragraph 23 of the complaint requires more extended consideration. The paragraph reads:

"23. Because papers belonging to plaintiff BSC are wrongfully and unlawfully in the possession of defendant, plaintiff has been suffering and in the future will suffer injury, loss, and damage resulting from the liability of its officers to consult such papers and take appropriate action thereof, the loss of business opportunities resulting therefrom, and the loss of good will resulting from the need to request from other parties copies of correspondence originally sent or received by BSC, all of which injury, loss and damage is in a substantial monetary amount but is not capable of exact monetary computation and is therefore irreparable".

Defendant asserts that plaintiff should be required

to plead in what manner, to what extent and with what parties has a monetary loss been sustained. At the outset, it should be observed that, in equitable actions, the averment of "irreparable damage" serves a dual purpose: (1) the principal function is to support the prayer for an injunction; and (2) the subordinate function is to lay a foundation for the award of *incidental damages*. In Fountain Hill Underwear Mills v. Amalgamated Clothing Workers' Union of America, 393 Pa. 385 (1958), the Supreme Court reversed the decree of the lower court, which dismissed a suit for an injunction against illegal picketing on the ground that plaintiff had instituted an action at law in trespass for damages, and said through Mr. Justice Benjamin R. Jones:

"Moreover, the filing of a complaint in trespass for damages does not oust equity of its jurisdiction, or prove that plaintiffs have a complete and adequate remedy at law. In Wortex Mills, Inc. v. Textile Workers Union of America, 380 Pa. 3, 109 A. 2d 815, we specifically recognized that equity relief which both prevents continued injury and allows damages for the harm already caused by the same unlawful act is not incompatible in a labor, or any other, controversy.[8]

"[8 'Ordinarily a Court of Equity has no jurisdiction to award damages for tortious or illegal acts, but this is subject to the well recognized principle that once equitable jurisdiction has attached, equity has jurisdiction to do *complete* justice between the parties and, inter alia, award damages for tort (or for breach of contract), as well as grant other equitable relief: (citing cases).' Wortex Mills, Inc. v. Textile Workers Union of America. . . .] The fact that such relief is sought in two separate actions is immaterial. Our decisions hold only that once equity has assumed jurisdiction a court *may* award incidental damages; it is not mandatory for equity to do so, nor does a failure

to do so bar a plaintiff from securing such relief".
(Footnote within brackets.)

The power of courts of equity to award incidental damages is a part of their jurisdictional endowment, which is saved from modification under the new Pennsylvania Rules of Civil Procedure by section 1 of the Act of June 21, 1937, P. L. 1982, as amended by the Act of March 30, 1939, P. L. 14 and the Act of August 25, 1959, P. L. 751, 17 PS §61, notwithstanding that rule 1501 provides that procedure in equity shall be in accordance with the rules relating to the action of assumpsit and that rule 1509(a) provides that, in equity, the preliminary objections authorized by rule 1017(b) are available to any party. The subject of preliminary objections calling for more specific pleading was discussed and applied in the case of Spock v. Briel, Sr., 4 D. & C. 2d 47 (C. P. Northumberland Co., 1954), where Judge Troutman said:

"The sixth reason assigned by the defendant in support of his preliminary objection is that the complaint fails to set forth the *specific irreparable injury and damage* suffered by the plaintiffs. The complaint avers that there was a joint enterprise established for the purpose of obtaining television reception for all of the parties; that the defendant had control of the operation of the television system, the said controls being operated from his residence; that on December 3, 1953, the defendant, without cause or reason, did control the television equipment so as to prevent the plaintiffs from getting reception on their television sets and that the plaintiffs have no other adequate means of controlling television reception on their television sets and are, therefore, deprived of their interest in the said enterprise by reason of the acts of the defendant. From the allegations of the complaint, the defendant has interfered and prevented the other members of the joint enterprise from receiving tele-

vision programs on their television sets through the facilities set up by the enterprise. The complaint specifically sets forth interferences with a property right as well as a personal right of each individual plaintiff. We can find no merit in this reason.

"A more specific complaint will not be required where the complaint is sufficiently clear that there can be no question of the matter in controversy and the defendant is able to know exactly what he must defend: Yonkovig v. Yonkovig, 23 Northumb. 57.

"We are of the opinion that the complaint is sufficiently specific and, therefore, find no merit in the defendant's preliminary objection in the nature of a motion for a more specific complaint". (Italics supplied.)

In the instant case, the basic averment of irreparable damage is amplified by averments that, as the result of defendant's wrongful conduct, plaintiff suffers from the inability of its officers to consult with the corporate papers and files withheld and to take appropriate action thereon, and from loss of business opportunities and good will. For the purposes of an action in equity seeking an injunction, we think that paragraph 23 of the complaint is sufficiently specific.

ORDER

And now, January 11, 1966, preliminary objections are dismissed. Defendant is allowed 20 days to file an answer to the complaint.